IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-HC-2148-F

THOMAS MOORE, Jr.,                    )
                                      )
            Petitioner,               )
                                      )
      v.                              )           ORDER
                                      )
ALVIN W. KELLER, Secretary of N.C.    )
Department of Correction, and         )
MICHAEL HARDEE, Administrator of      )
Hyde Correctional Institution,        )
                                      )
            Respondents.              )

This matter arises from the petition for writ of habeas corpus (D.E. # 1), pursuant to 28

U.S.C. § 2254, filed by Thomas Moore, Jr. ("Moore" or "petitioner"). Petitioner is a state inmate

under sentence for convictions on counts of first degree burglary and assault with a deadly weapon

with intent to kill inflicting serious injury. Presently before the court are respondents' motion for

summary judgment [D.E. # 8], petitioner's response and cross-motion for summary judgment [D.E.

# 14], and other miscellaneous motions filed by petitioner. These matters are ripe for ruling. For

the reasons that follow, the court orders that respondents' motion for summary judgment will be

granted-in-part and denied-in-part, and that petitioner's motion for summary judgment will be

granted-in-part and denied-in-part.

1

# STATEMENT OF THE CASE

I.    Background Facts

Moore was tried on April 23, 2007, in the Superior Court of Edgecombe County. He was convicted on April 26, 2007. The following facts underlying the crimes for which Moore was convicted are taken from the opinion of the North Carolina Court of Appeals affirming the conviction in State v. Moore, 189 N.C. App. 532, 659 S.E.2d 489, 2008 WL 851054 (N.C. Ct. App. 2008) (unpublished table decision).

> The State's evidence tended to show that on 7 June 2006, Helen and Richard Overton were at their home in Macclesfield, North Carolina, when, at approximately 11:00 p.m., Helen Overton observed defendant standing at her door. Richard Overton was asleep on the couch in another room at the time. Helen Overton testified that defendant stated to her that "his car had broke [sic] down in front of the shop down the road. He said, I don't know who owns it but my car is broke [sic] down there. And I need to use your phone to call someone." Helen Overton asked defendant whom he wished to call, and he said his aunt. She then asked defendant for the phone number, and defendant stated, "It's a seven, five, three number." Helen Overton testified, "I thought to myself that's a Farmville number. Because we used to live in Farmville years ago." Helen Overton became suspicious and testified that "when he asked me to use the phone I immediately just like took one step backwards.... We were within 2 feet face to face. And I immediately stepped back and was going to shut the door and go get Richard." Helen Overton explained that after she stepped back, defendant brandished a gun and pushed his way inside.
>
> Helen Overton testified that she began screaming when defendant forcibly entered her house, and that she observed "another black male coming from the front of the carport up to the steps." She believed that the other individual was carrying a gun, as well. Helen Overton stated that she then pushed the door shut and attempted to lock it in order to prevent the second individual from entering the house. As she was attempting to lock the door, defendant began hitting her hands, preventing her from locking the door. She then "turned around and backed up against the door," at which point defendant told the other individual to "kick the door in." Helen Overton testified that she then felt the door hit her in the back as it was kicked in. At that time, she also saw Richard Overton enter the room, and "[t]hat's when [defendant] started shooting. He was shooting right across in front of her face at Richard." After shooting Richard Overton, defendant pointed the gun at Helen Overton, threatening to kill her. Helen Overton pushed defendant away, and

2

defendant pushed her back and ran out the door.

Helen Overton then locked the door and went to the kitchen, where she found Richard Overton "standing in the middle of the kitchen floor. And he was holding his chest and the blood was just spurting out." Richard Overton sustained two gunshot wounds—one to his shoulder and the other to his hand. Helen Overton retrieved a towel for her husband and then, after unsuccessfully attempting to contact emergency services, called both her daughter and her brother. Law enforcement and emergency personnel subsequently arrived and transported Richard Overton to the hospital.

Although Helen Overton did not recognize the assailants on the night of the attack, she told the police when they arrived "[t]hat Richard told her that it was the same man as last time." Richard Overton, who only saw defendant and not the other individual outside the house, told the police that the assailants were "those damn Moore boys that robbed [him] three years ago."[1] Two days after the attack, Helen Overton identified defendant from a photographic lineup, basing the identification upon seeing him on the night of the attack.

[1] The Overtons had filed charges against defendant and his brother, Linwood Moore, for an alleged robbery several years prior. The trial court in that case dismissed the charges against defendant, and Linwood Moore was found not guilty. The State in the instant case filed a motion in limine to exclude evidence of the prior robbery accusation against defendant and his brother by the Overtons. At the beginning of trial on 25 April 2007, the trial court denied the State's motion.

2008 WL 851054, *1-*2.

II.    Procedural History

Immediately after petitioner's conviction, the trial judge requested that petitioner submit to a lie detector test, to which petitioner agreed. Trial Transcript ("Tr.") 169, ex. 9 to Resps.' Mem. [D.E. # 9-12]. The trial judge then arrested judgment until May 15, 2007. Id. On May 14, 2007, successor counsel for petitioner filed a motion for appropriate relief ("MAR") challenging the sufficiency of the evidence underlying petitioner's conviction. On May 29, 2007, counsel filed another MAR, this time requesting an evidentiary hearing on whether or not law enforcement

3

informed Richard Overton of certain facts related to petitioner's brother in advance of trial. The trial court denied both MARs and ultimately sentenced petitioner to a term of 73-97 months imprisonment on the assault with a deadly weapon conviction and a consecutive sentence of 64-86 months imprisonment on the first degree burglary conviction.

Petitioner appealed the convictions and sentences to the North Carolina Court of Appeals. On appeal, petitioner argued 1) that there was insufficient evidence that "he was the perpetrator of the crimes[,]" and 2) "that the trial court committed plain error by admitting a firearm, a pair of latex gloves, a written report of an absent SBI forensic examiner's findings and conclusions, and testimony about that forensic examiner's findings and conclusions." Moore, 2008 WL 851054 at *4. As to petitioner's arguments regarding the sufficiency of the evidence, the court determined that petitioner's challenge was to the credibility of the witnesses against him and that such matters are properly left to the jury. Furthermore, while the court agreed with petitioner that admission of the forensic report and physical evidence was erroneous because such evidence was irrelevant and prejudicial, the court determined that the trial court did not commit plain error because the court did not believe that "absent the error the jury probably would have reached a different verdict." Id. at 6 (quotation omitted). The court also agreed with petitioner that admission of the report was erroneous because, although the court believed the report fit within the "business record" exception to the hearsay rule, it nevertheless was not properly introduced as a business record. Id. at 7. However, the court again found that admission of the report was not plain error because it "could not have tilted the scales and caused the jury to reach its verdict convicting the defendant." Id. (quotations omitted). Finally, the court rejected petitioner's argument that admission of the report violated his Sixth Amendment Confrontation Clause rights because, according to the court, "the

4

forensic report–containing the results of the analysis performed on the firearm and the DNA analysis performed on the latex gloves–does not constitute a testimonial statement admitted in violation of a defendant's rights under the Confrontation Clause." Id. at *8. Accordingly, having found no error in part and no plain error in part, the appellate court affirmed petitioner's convictions and sentences. Id.

On May 6, 2009, petitioner filed a MAR alleging several claims of ineffective assistance of trial counsel. The state court did not conduct a hearing on the MAR and issued an order summarily denying it on August 4, 2010. Petitioner's request for certiorari review was denied on August 2, 2011.

On August 2, 2011, petitioner filed the instant petition for writ of habeas corpus with this court. On August 23, 2011, respondents filed their motion for summary judgment and supporting memorandum. On October 4, 2011, petitioner filed his response and cross-motion for summary judgment. On October 7, 2011, respondents filed a response to the cross-motion for summary judgment. The matter is now ripe for ruling.

## DISCUSSION

I.    Standard of Review

    A.    Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp, 477 U.S. at 323. Once

5

the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Section 2254(d)

The court's review of Petitioner's claims is governed by 28 U.S.C. § 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

6

case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. __, __, 130 S.Ct. 841, 849 (2010). See also Winston v. Kelly, 592 F.3d 535, 554 (4th Cir. 2010) ("For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable.") (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007)). Thus, while "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, erects a substantial bar for state inmates seeking habeas relief in federal court.[1]

---

[1]    In this vein, the Supreme Court recently observed as follows:

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

(continued...)

7

The statute "does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one." Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Id. at 158. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 562 U.S. at __, 131 S.Ct. at 784-85. Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000).

Only after a petitioner establishes that the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). See also Frazer v. South Carolina, 430 F.3d 696, 718 (4th Cir. 2005) ("Because the state court's decision in this case was both contrary to and involved an unreasonable application of clearly established federal law, the district court properly reviewed Frazier's claim de novo."); Lynch v. Polk, 204 F. App'x 167, 170 (4th Cir. 2006) (unpublished

---

[1](...continued)

Harrington v. Richter, 562 U.S. __, __, 131 S.Ct. 770, 786-87 (2011).

8

decision) ("If a legal or factual error of the degree specified in § 2254(d)(1) or (d)(2) occurred, then a federal court has the obligation to conduct an independent review of the petitioner's claims to determine whether the issuance of a writ is warranted.").

II.    Petitioner's Claims

Petitioner asserts that he is entitled to habeas corpus relief pursuant to § 2254 because his trial counsel rendered ineffective assistance of counsel as alleged below:

Claim I.A - Trial counsel failed to consult with and call as a witness an expert in the fallibility of eyewitness testimony.

Claim I.B - Trial counsel failed to move to suppress the out-of-court identification of petitioner by Helen and Richard Overton.

Claim I.C - Trial counsel failed to move to suppress the in-court identification of petitioner by Helen and Richard Overton.

Claim I.D - Trial counsel failed to cross examine Richard Overton on his eyesight and his opportunity to view the intruder.

Claim I.E - Trial counsel failed to object to the admission of a weapon that was unrelated to petitioner's case as well as forensic reports and testimony regarding the weapon and forensic testing.

III.    Analysis

Respondent concedes that petitioner "raised the substance of his current ineffectiveness assertions in his May 6, 2009 MAR and/or his June 8, 2009 amendment to the MAR," which he then pursued through discretionary appeal with the state appellate court. Resps.' Supp. Mem. 8. Thus, in accordance with 28 U.S.C. § 2254(d), this court must determine whether the state court's adjudication of petitioner's claims was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts adduced in state court.

9

All of petitioner's claims are premised on his assertion that trial counsel rendered ineffective assistance in preparing and presenting petitioner's defense at trial, in violation of petitioner's rights under the Sixth Amendment to the United States Constitution, as explicated in Strickland v. Washington, 466 U.S. 668 (1984). Thus, it is appropriate at this juncture to set forth the standards governing the court's analysis of such claims. The United States Court of Appeals for the Fourth Circuit recently described these standards as follows:

> To demonstrate ineffective assistance of counsel, Petitioner must show "that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003). Regarding the first prong, a "deficient" performance is one that falls "below an objective standard of reasonableness." Id. at 511. Petitioner must show "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." Harrington, [562 U.S. at __], 131 S.Ct. at 787 (internal quotations marks omitted). See also Strickland v. Washington, 466 U.S. 668, 687 (1984) ("First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

> [A court's] deferential assessment of counsel's performance must "include [] a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time . . . ." Wiggins, 539 U.S. at 523 (internal quotation marks omitted). Further, we must resist the temptation to "second-guess counsel's assistance after conviction or adverse sentence" and make "every effort . . . to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Indeed, we must review with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." Harrington, [562 U.S. at __], 131 S.Ct. at 788 (internal quotation marks omitted).

Decastro v. Branker, 642 F.3d 442, 450 (4th Cir. 2011).

As to the second Strickland prong, prejudice, petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Thus, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688.

10

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. This showing "requires a substantial, not just conceivable, likelihood of a different result." Cullen v. Pinholster, 563 U.S.__, __, 131 S.Ct. 1388, 1403 (2011) (internal quotations omitted). "The totality of the evidence before the judge or jury must be considered in making this determination." Williams v. Ozmint, 494 F.3d 478, 484 (4th Cir. 2007) (internal quotation marks omitted).

In Harrington, the Supreme Court discussed the interplay of the Strickland ineffectiveness standard and the deferential review standard of AEDPA when a habeas petitioner alleges ineffective assistance of counsel.

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, *supra*, at 410. A state court must be granted deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> . . .
>
> "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. __, __, 130 S.Ct. 1473, 1485 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id. at 689; see also Bell v. Cone, 535 U.S. 685, 702 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from

11

best practices or most common custom. <u>Strickland</u>, 466 U.S., at 690.

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," <u>id.</u>, at 689; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333 n.7 (1997), and when the two apply in tandem, review is "doubly" so, <u>Knowles[</u> <u>v. Mirzayance</u>, 556 U.S. __, __, 129 S.Ct. 1411,1420 (2009)]. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at __, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Harrington</u>, 562 U.S. at __, 131 S.Ct. at 785, 788 (emphasis in original).

A.    Claim I.A

In claim I.A, petitioner argues he received the ineffective assistance of counsel due to his attorney's failure to consult with and call as a witness an expert in the fallibility of eyewitness testimony at trial. Pet. 8. He asserts that the "effect of complicating factors on memory is not within the common experience of juries, and without assistance, juries tend to perceive that eyewitness testimony must be correct. An expert on the psychological factors of memory and identification could have testified regarding a number of particular contextual factors which would have greatly assisted the jury in weighing the credibility of the identification of Thomas Moore made by Helen Overton and Richard Overton." <u>Id.</u> According to petitioner, these factors include, *inter alia*, the following: 1) that high stress and the presence of a weapon likely impaired the witnesses' perceptions and memories of events; 2) that this was a cross-racial identification; 3) that the Overtons' identifications of petitioner could have been a product of "unconscious transference," and that Helen Overton's identification was also likely influenced by her husband's prior identification of petitioner; 4) that the photo lineup in which Helen Overton identified petitioner was improper because of the

12

witness's prior familiarity with petitioner; 5) that a witness is more likely to adhere to a faulty memory, thus mitigating the value of the subsequent in-court identifications of petitioner; and 6) that Richard Overton's identification of petitioner was likely the product of his prior experience of being robbed in his home, which he also blamed on petitioner and his brother, and his expectations based on that experience. Id. at 8-11. Petitioner asserts that these factors, taken together with the fact that the State presented no other evidence at trial linking him with the crime or otherwise tending to establish his guilt, illustrate why the expert testimony which counsel failed to present was so vital to a constitutionally sufficient defense in this case.[2]

The MAR court did not conduct an evidentiary hearing before summarily denying this claim on the merits. See Aug. 4, 2010, MAR Order, Record on Appeal Regarding DNA Testing, ex. 5 to Resps.' Mem. in Supp. of Summ. J. [D.E. # 9-6]. Specifically, the MAR court found as follows:

> The court finds that evidence as to the out-of-court and in-court identification of the defendant was fully presented to the jury, including evidence that one of the two persons identified by a witness for the state was not present at the time of the commission of the crimes. The jury also heard evidence that at an earlier time the defendant was acquitted of crimes allegedly committed against the victims of these offenses. The jury heard all of the evidence surrounding the identification of the defendant and the weight of that evidence was for the jury. The witnesses were examined and cross examined regarding the identifications. **The defendant does not suggest that there is any more evidence regarding the identification**. The Court concludes any error in failing to request a voir dire on the identification was harmless and not prejudicial; and that **there was no showing to justify or require an expert on identification**.

---

[2] Petitioner's contentions in this regard essentially mirror his arguments in his state court MAR. See Motion for Appropriate Relief 11-12, ex. D to Pet [D.E. # 1-4]. In state court petitioner relied, as he does in this court, upon the extensive affidavit of Dr. Lori Van Wallendael, a professor of psychology who specializes in the psychology of witness memory and has previously qualified as an expert on eyewitness memory in North Carolina courts. The Van Wallandael affidavit thoroughly discusses the factors identified in the petition and describes their relevance within the facts established by trial testimony.

13

Id. at 2 (emphasis supplied). Against this backdrop of relevant factual findings, the MAR court, purporting to apply the Strickland standard without citing to that or any other case, determined that petitioner's claim was without merit. Id. Petitioner filed a petition for writ of certiorari with the North Carolina Court of Appeals seeking review of the MAR court's ruling (see Petition for Writ of Certiorari, ex. I to Pet. [D.E. # 1-9]), which was denied (Aug. 2, 2011, Order, ex. L to Pet. [D.E. # 1-12]).[3]

Respondents appear to argue that the MAR court's ruling denying this claim on the merits is not unreasonable within the meaning of § 2254(d) because the state court relied upon the fact that counsel cross-examined the witnesses to elicit weaknesses in their testimonies, thereby rendering his performance constitutionally adequate. Resps.' Supp. Mem. 7. Thus, respondents contend, "a reasonable argument obviously exists, that counsel satisfied Strickland's deferential standard." Id. at 10 (quotations omitted).[4] Respondents also argue that there is no "Supreme Court authority

---

[3]     Because this claim was denied on the merits by the MAR court and the North Court of Appeals declined to exercise discretionary review of the claim, the MAR court's ruling is the relevant state court decision for purposes of applying § 2254(d). See Frazer, 430 F.3d at 706 n.7; id. at 726-727 (Luttig, J., dissenting) ("Under no circumstance can a discretionary denial of certiorari be relevant to the inquiry mandated by section 2254(d).").

[4]     In this respect, respondents place particular emphasis on the recent Supreme Court decisions in Harrington v. Richter and Cullen v. Pinholster, the pertinent points of which are discussed previously in this order. Respondents maintain that these decisions have somehow "profoundly impacted, and dramatically reduced, the availability of federal habeas corpus relief for state prisoners, especially those raising claims [of] ineffective assistance of counsel, like Petitioner." Resps.' Resp. Mem. [D.E. 16] 1-2. While Harrington admittedly describes the availability of habeas corpus relief in stark terms, it does not introduce any new limitations on habeas corpus or otherwise reduce the availability of the writ. The Fourth Circuit, even after Harrington, continues to affirm the viability of the writ when the limited circumstances permitted by the statute are established. See Elmore v. Ozmint, 661 F.3d 783 (4th Cir. 2011) (applying § 2254(d), after Harrington, and reversing federal district court's denial of habeas corpus); id. at 872 ("[W]e see a meaningful role for the federal courts in safeguarding the constitutional rights of state prisoners . . . . And we enjoy
(continued...)

14

mandating that counsel hire an 'expert in the fallibility of eyewitness testimony,'" and that, in fact, "there is federal authority holding that defense counsel is not ineffective for failing to do so, and may reasonably rely on traditional cross-examination." Id.

It is hardly remarkable or novel to observe that that eyewitness identification is particularly susceptible to a host of environmental and psychological influences which can render a given identification, if not flatly erroneous, at least dubious for purposes of a criminal trial. See, e.g., United States v. Wade, 388 U.S. 218, 228 (1967); see also Perry v. New Hampshire, _ U.S. _, _, 132 S.Ct. 716, 730-31 (2012) (Sotomayor, J., dissenting) ("This Court has long recognized that eyewitness identifications' unique confluence of features–their unreliability, susceptibility to suggestion, powerful impact on the jury, and resistance to the ordinary tests of the adversarial process–can undermine the fairness of a trial."). Hence, a complicated line of jurisprudence has developed concerning how a court should go about assessing the reliability of eyewitness testimony as a predicate to its admissibility consistent with the requirements of due process. See id. at 723-25. While these authorities are not necessarily germane to the issue presently before the court, Justice Sotomayor's very recent summary of just some of the myriad research which has validated the "empirical premises" of these precedents drives home the court's larger point about the fallibility of eyewitness testimony:

---

[4] (...continued)
illustrious company–the Supreme Court itself–in that view."). Thus, the writ remains viable and Harrington, for all of the import which respondents would ascribe to it, has in no way eviscerated or even appreciably limited this court's authority to grant the writ beyond the understanding of § 2254(d) which existed prior to that decision. In short, even after Harrington, when a federal court is reviewing a claim of ineffective assistance of counsel, it is not sufficient that a state post-conviction court merely "uttered the word 'Strickland [or, as in this case, enunciated its standard],' [the court's] AEDPA analysis–in line with that of the Supreme Court–is more demanding." Id.

15

The empirical evidence demonstrates that eyewitness misidentification is the single greatest cause of wrongful convictions in this country. Researchers have found that a staggering 76% of the first 250 convictions overturned due to DNA evidence since 1989 involved eyewitness misidentification. Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by postevent information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy; and that suggestiveness can stem from sources beyond police-orchestrated procedures.

Id. at 738-39; see also Elizabeth F. Loftus, et al., Eyewitness Testimony: Civil and Criminal § 1-2 (4th ed. 2007) [hereinafter Eyewitness Testimony] ("Certainly one of the most important facts that we have learned from the analyses of DNA exoneration cases is that eyewitness error is the leading cause of wrongful conviction in the United States."). Because eyewitness identifications are often flawed and so prevalent in wrongful convictions, in cases where, as here, eyewitness identification constitutes the whole of the prosecution's evidence of guilt, defense counsel's duty to scrutinize eyewitness testimony is of paramount importance.

Nor is it a remarkable or novel observation that, often, an expert witness will be essential to educate the jury about the weaknesses of eyewitness identifications which are not generally known by jurors, as well as to explain how abstract theories of psychology and social science might apply to the unique facts of the case before the jury.[5] The recent Supreme Court decision in Perry confirms this. The Court, in explaining its "unwillingness to enlarge the domain of due process" by requiring

---

[5]  See, e.g., United States v. Brownlee, 454 F.3d 131, 142 (3d Cir. 2006) (quotations and citations omitted) ("Even more problematic, jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable. Thus, while science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge, and often contradicts jurors' commonsense understandings. To a jury, there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says[,] 'That's the one!'").

16

a preliminary determination of reliability of an eyewitness identification without evidence of government misconduct in securing the identification, observed that there are a number "of other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability," including cross-examination, "eyewitness-specific jury instructions," and "expert testimony on the hazards of eyewitness identification evidence." 132 S.Ct. at 728-729. Thus, while skillful cross-examination may succeed in exposing obvious inconsistencies in an eyewitness's account, because "nothing is obvious about the psychology of eyewitness identification" and "most people's intuitions on the subject of identification are wrong," Phillips v. Allen, _ F.3d _, _, 2012 WL 414815, *3 (7th Cir. Feb. 10, 2012), some circumstances undoubtedly call for more than mere cross-examination of the eyewitness. Indeed, as late as 1993, the Fourth Circuit recognized that, in limited circumstances, expert testimony on the validity of eyewitness identifications may be appropriate in order to complement effective cross-examination of eyewitnesses.

> The narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena [such] as the feedback factor, and unconscious transference. . . . Outside of such narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination."

United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993) (citations and quotations omitted).[6] See also Ferensic v. Birkett, 501 F.3d 469, 477 (6th Cir. 2007) (emphasis in original) (observing that testimony of eyewitness identification expert improperly excluded by the trial court "would have

---

[6] As will be further discussed infra, several of these "narrowly constrained circumstances" recognized by the Fourth Circuit in 1993 are prevalent in this case.

informed the jury of *why* the eyewitness's identifications were inherently unreliable. This would have been a scientific, professional perspective that no one else had offered to the jury."). Moreover, as the Sixth Circuit concluded in Ferensic, even effective cross-examination is no substitute for expert testimony in certain circumstances. Id. at 481-82 ("We agree with the district court that 'other means' of attacking eyewitness identifications do not effectively substitute for expert testimony on their inherent unreliability.").

Nevertheless, some courts continue to adhere to the traditional view that skillful cross-examination of a given eyewitness, to the extent it exposes weaknesses or inconsistencies, is sufficient to satisfy counsel's Sixth Amendment obligation. As an example, respondents cite to Howard v. Clark, 608 F.3d 563, 574 (9th Cir. 2010), in which the court determined that the habeas petitioner was not prejudiced by his counsel's failure to call an expert witness. However, Howard is illustrative of an important point which distinguishes this case from many of the cases in which courts have rejected claims similar to petitioner's. In Howard, while the court noted the attorney's cross-examination of witnesses, the court observed that, "even more significantly [that counsel's cross-examination], the jurors were instructed on the potential shortcomings of eyewitness testimony." Id. Other courts have similarly relied upon jury instructions as a substitute means of educating the jury about common flaws with eyewitness identifications in order to excuse counsel's failure to produce expert testimony. See, e.g., Rose v. Evans, 414 F. App'x 1, 5-6 (9th Cir. 2011). As petitioner points out, both Howard and Rose, which is also cited by respondents, are cases out of California, which requires the giving of jury instructions which provide jurors with numerous factors to consider in weighing the reliability of eyewitness testimony. In fact, Rose incorporates a portion of those factors into its text. Id. By contrast, it is undeniable that no such instructions were

18

given in this case. The trial court's instructions to the jury only briefly and generically addressed the essential issue of eyewitness reliability:

> In determining whether to believe any witness you should apply the same test of truthfulness which you apply in your everyday affairs. And these tests may include the opportunity of the witness to see, hear, know or remember the facts or occurrences about which the witness testified, the manner and appearance of the witness, any interest, bias or prejudice the witness may have, the apparent understanding and fairness of the witness, whether the testimony is reasonable and whether the testimony is consistent with other believable evidence in the case.

Trial Tr. 147-48. In short, the jury instructions in this case simply do not suffice to alert the jury to the host of factors which complicate assessment of the reliability of the eyewitness identifications in this case.

Another important point raised in some cases denying claims like petitioner's is the strength of other evidence of guilt apart from the eyewitness identification. For example, in Woodard v. Thaler, 414 F. App'x 675, 682 (5th Cir. 2011), the Fifth Circuit rejected the petitioner's claim that counsel was ineffective for failing to offer expert testimony about eyewitness identifications, concluding that the petitioner could not show prejudice because other evidence of his guilt was "overwhelming."[7] In this case, however, as in Forensic, "[t]he entirety of the evidence against [petitioner] was based upon eyewitness identifications made by the victimized couple." 501 F.3d at 470. Other evidence introduced by the prosecution, including a firearm, latex gloves, and a forensic report concerning these items, could not be connected to petitioner or the crime itself and

---

[7] Similarly, the Fourth Circuit has rejected a habeas petitioner's claim that his counsel was ineffective in failing to offer the testimony of a DNA expert because "it is most unlikely that, even with an expert, [the petitioner] could have overcome the totality of evidence against him, which included not just forensic evidence, but also [a co-offender's] testimony, eyewitness testimony placing him in the vicinity of the store, and [another witness's] testimony regarding his actions after the murder." Yarbrough v. Johnson, 520 F.3d 329, 339-40 (4th Cir. 2008).

19

was erroneously admitted. <u>Moore</u>, 2008 WL 851054, *5. Given the primacy of the eyewitness identifications in this case, and as discussed in <u>Forensic</u>, expert testimony capable of undermining the eyewitnesses' testimonies beyond the capacity of mere cross-examination and attorney argument was of particular import. <u>See</u> 501 F.3d at 482 ("The significance of [excluded expert testimony] cannot be overstated. Without it, the jury had no basis beyond defense counsel's word to suspect the inherent unreliability of the [victims'] identifications. The Supreme Court has long recognized this obliviousness as inimical to our system of criminal justice.").

So, accepting generally that eyewitness identifications are susceptible to numerous influences which can affect their reliability, that faulty eyewitness identifications account for the majority of wrongful convictions, that expert testimony can be essential to explain to the jury the complex reasons why a given identification may be unreliable, that there were no jury instructions embracing the numerous factors potentially affecting the reliability of the eyewitness identifications, and that there is no other evidence of petitioner's guilt, the court turns to the unique facts of this case. According to the affidavit of the expert witness submitted to the MAR court, there are numerous factual circumstances present in this case which indicate that the testimony of an expert witness would have been particularly useful in helping the jury to assess the reliability of the eyewitness identifications. The court will address these below.

1. Stress and the "Weapon Focus Effect"

Dr. Van Wallendael observed that, "given the threat of the perpetrator's gun, the victim/witness can be inferred to have been under stress, and studies show that high levels of stress reliably impair memory. The presence of the gun is itself a highly distracting factor. Research on the 'weapon focus effect' has consistently shown that the presence of a weapon decreases a witness's

20

ability to identify the perpetrator's face in a subsequent lineup or photo-array." Affidavit of Expert Witness at ¶ 8 ("Van Wallendael Aff."), ex. 6 to May 6, 2009, Motion for Appropriate Relief, ex. D to Pet [D.E. # 1-4].[8] See also Eyewitness Testimony §§ 2-9 & 2-10.

At trial, Helen Overton testified that she had a brief conversation, at close range, with the intruder before he produced a gun and forced his way into her home. Trial Tr. 21-23. Once she "saw the gun [she] just panicked" and "started screaming." Id. at 23. To the extent Richard Overton had any opportunity to view the intruder who shot him, such observation occurred only as the intruder was brandishing and firing his gun at Mr. Overton. Id. at 47. In fact, Mr. Overton's testimony clearly illustrates the operation of the "weapon focus effect" theory advanced by Dr. Van Wallendael: "When I first saw him he was standing over away from my wife with one hand - I don't know but he had the pistol I'm thinking in his right hand. **The pistol was - all I could see that pistol he was shooting in his face**. He was shooting –." Id. at 47-48. Although Mr. Overton also testified that he was somehow able to recognize the petitioner's face, id. at 48, it is not clear when or how he was able to study the face of the intruder during the few seconds they were in proximity, as Mr. Overton was consumed with the task of scrambling to get his gun from its holster, focusing his attention on the intruder's gun as he turned to raise his own firearm, suffering multiple gunshots, and crawling on the floor attempting to retrieve his gun after being shot. Id. at 48-49.[9] Nevertheless,

---

[8]    Of course, "identification after observation under stress" is one of the "narrow circumstances held sufficient to support the introduction of expert testimony" recognized by the Fourth Circuit in 1993. Harris, 995 F.2d at 535.

[9]    Mr. Overton later testified that he was "looking at [petitioner] right in the face while he was pulling the trigger." Tr. 52. This testimony appears to contradict both Mr. Overton's prior testimony that the "pistol was–all I could see that pistol he was shooting," as well as the considerable psychological evidence of the "weapon focus effect."

21

despite the fact that Helen Overton was the only witness with the opportunity to observe the intruder free of any "weapon focus effect,"[10] and despite the fact that she was already familiar with petitioner from the trial concerning the Overtons' prior accusations against him, she did not immediately identify petitioner as the intruder to responding law enforcement officers. Id. at 32.[11] Instead, it was Richard Overton who vehemently insisted that it was the "same ones as last time" to responding law enforcement.

### 2. Cross-Racial Identification

Dr. Van Wallendael's affidavit also discusses the problematic nature of cross-racial identifications like this one. "One of the most accepted findings in memory research is that cross-racial identifications are significantly less accurate than within-race identifications. False identifications are more common for cross-race identifications." Van Wallendael Aff. ¶ 9. See also Eyewitness Testimony § 4-13 ("It is well established that there exists a comparative difficulty in recognizing individual members of a race different from one's own.").[12]

### 3. "Unconscious Transference" and Witness Expectations

---

[10] Even if Helen Overton had the opportunity to observe the intruder without the distorting effects of "weapon focus," it is likely that even her initial observation of the intruder was influenced by stress. Given the circumstances–late at night, her dog loudly barking, two ostensible strangers showing-up at her door unexpected–it is reasonable to conclude that Mrs. Overton's brief conversation with the intruder before he brandished his firearm was quite alarming and stressful.

[11] Helen Overton first generically described the intruder to responding law enforcement officers as "a black male, skinny and wore dark clothing." Tr. 94.

[12] Cross-racial identification is another of the "narrow circumstances held sufficient to support the introduction of expert testimony" recognized by the Fourth Circuit in 1993. Harris, 995 F.2d at 535. Courts consistently acknowledge the considerable scientific data demonstrating that cross-racial identifications are "particularly unreliable." Gonzales v. Thaler, 643 F.3d 425, 432 (5th Cir. 2011). See also United States v. Jernigan, 492 F.3d 1050, 1054 (9th Cir. 2007) ("Cross-racial identifications . . . are particularly suspect.").

22

Dr. Van Wallendael's affidavit also indicates that the psychological phenomenon of "unconscious transference" could account for the identifications in this case and should have been explained to the jury.[13]  Dr. Van Wallendael explains that

> both complaining witnesses had a previous acquaintance with Thomas Junior Moore. Both witnesses had significant exposure to Moore during the 2004 trial. . . . And although [Helen Overton] claimed during the trial that she was not merely identifying Moore from previous exposures to him, but from the actual crime scene, there is no way that the witness (or anyone else) can be certain of this. Modifications to memory are made unconsciously, and once they are made, they cannot be undone or picked apart.

Van Wallendael Aff. ¶ 13. Dr. Van Wallendael also opines that Richard Overton's identification of petitioner is likely the product of unconscious transference and his expectations given the previous, similar robbery at his home.

> The male witness had already been a victim of a similar crime several years prior to this incident.  At the time of the first crime, he told the police that the two perpetrators were the Moore brothers, whom he knew from business dealings.  The two perpetrators in the first incident were wearing masks, but the witness convinced himself that the Moore brothers were responsible.  He saw the brothers at the trial, and whenever he recalled the crime, he probably "saw" the Moore brothers' faces as the faces of the perpetrators.  Now flash forward to the second crime.  The male witness is relaxing on the couch when he hears his wife screaming.  He almost certainly thinks back to the first crime as he is running to get his gun and help his wife.  Perception and memory are heavily influenced by expectations and past experiences. He sees the gunman for a second or two, as the gunman begins shooting at him.  He makes a connection in his mind, consciously or unconsciously, with the previous crime, and takes in details of the shooter's appearance that are consistent with his memory of the previous crime.  We know that his perceptions were influenced by his past experience, because he tells the police that it was the same two men as the last time–even thought he only saw one gunman, not two.  He admits that he assumed that there were two men–because there were two on the previous

---

[13]  "Unconscious transference" is yet another of the "narrow circumstances held sufficient to support the introduction of expert testimony" recognized by the Fourth Circuit in Harris. 995 F.2d at 535. The Fourth Circuit explained that "[u]conscious transference occurs when a witness confuses a person seen in one situation with someone seen in a different situation." Id. at n.2 (citation omitted). See also Eyewitness Testimony § 4-14.

occasion. At this point it is impossible to disentangle "assuming," "knowing" and "remembering" in his memory. He is then confronted with a photographic lineup. After stating that Moore was the perpetrator, it is no surprise that the witness was able to pick Moore out of a lineup.

Id. at ¶ 14.[14]

### 4. Other Circumstances Affecting Reliability

In addition to these factors which possibly could have affected the witnesses' ability to observe, remember, and identify the attacker at the time of the event, the expert could have provided additional testimony relevant to the jurors' assessment of reliability. For example, Dr. Van Wallendael could have testified about the likelihood that Richard Overton's post-event declaration that petitioner and his brother were the intruders influenced Helen Overton's own subsequent identification. See Van Wallendael Aff. ¶ 13 ("It is significant that the female witness did not report recognizing the perpetrator of the second crime spontaneously. She only describes him as a skinny black male. Although the wife did not herself name Thomas Junior Moore as her assailant, she did hear her husband make this identification before she was confronted with the lineup."). In this circumstance, the operative theory is that Mr. Overton's post-event declaration that the perpetrators were "the Moore boys" and "the same ones as last time" constituted "new information" which likely affected Mrs. Overton's own recollection of the event by the time she was confronted with the lineup and identified petitioner. This is yet another circumstance recognized in empirical research as a

---

[14] For more on the distorting effects a witness's expectations can have on perception, see Eyewitness Testimony § 2-11 (explaining research data that indicates a witness's "biases play a role in the perception of all sorts of incidents"). In short, it is common for a witness predisposed to believe a certain fact or overtly conscious of some expectation regarding an event to align those beliefs and expectations to the stimuli actually observed. Id.

24

major cause of witness misidentification.[15] See Eyewitness Testimony § 3-4 (addressing empirical data which indicates that "new information can do more than simply supplement a memory: it can apparently alter or transform the memory"); id. ("False information can be introduced into a person's recollection, and later this information may be reported as if it actually occurred. The false information can supplement the previously acquired memory . . . , or it can transform the recollection . . . . Witnesses pick up new information in many ways: (1) they talk to other witnesses; (2) they are asked questions by authorities; and (3) they read newspaper accounts and see television coverage of events they have witnessed. In all of these ways, the potential exists for new information to contaminate recollection."); id. at § 3-9 ("There is little doubt that human recollection can be supplemented, partly restructured, and even completely altered by postevent inputs. It is susceptible to the power of the simple word. . . . [W]e cannot ignore the possibility that some memories may undergo transformation due to postevent suggestion . . . .").

The expert also could have educated the jury about the danger of correlating a witness's supposed confidence in their identification with accuracy.[16] Opining about the general difficulties juries face in assessing the reliability of eyewitness testimony, Dr. Van Wallendael observed as follows:

---

[15] Unsurprisingly, this also is another of the "narrow circumstances held sufficient to support the introduction of expert testimony" recognized by the Fourth Circuit in Harris. 995 F.2d at 535. The Fourth Circuit described the "feedback factor" as a "psychological phenomen[on]" that "demonstrates that witnesses who discuss the case with each other may unconsciously reinforce mistaken identifications and their certainty in these identifications." Id. at n.2 (quotation and citation omitted).

[16] In Harris, the Fourth Circuit cited to another case, United States v. Stevens, 935 F.2d 1380, 1400 (3d Cir. 1991), as an example of another circumstance in which expert testimony about the reliability of eyewitness identifications was admitted in order to provide "testimony on the lack of correlation between confidence and accuracy in eyewitness identification."

25

The most salient clue that the juror has with which to evaluate the witness's accuracy is the witness's confidence. Unfortunately, psychological research has repeatedly shown that confidence and accuracy are very poorly related when it comes to identifying people. Sometimes witnesses show very little confidence in identifications that turn out to be absolutely accurate. At other times, witnesses make inaccurate identifications with "100% certainty." The problem with confidence as a cue to accuracy is that the factors that affect a person's confidence are often different from the factors that affect accuracy. Confidence can be inflated by information received after the fact, such as feedback from investigating officers or other witnesses. For these reasons, in-court identifications, no matter how confident, have very little value. I have no doubt that the eyewitnesses in this case genuinely believed in their identifications. However, I believe that the jury may have benefitted from learning more about the problems inherent in such identifications, problems that are not apparent to a "common sense" appraisal.

Van Wallendael Aff. ¶ 7. In general, "[s]tudies show that eyewitness testimony offered with confidence is likely to be believed by jurors." Eyewitness Testimony § 6-2. However, much empirical data indicates that "the confidence of an eyewitness is *not* necessarily a reliable predictor of accuracy." Id. (emphasis in original). This is attributable to "the extreme malleability of eyewitness confidence. As soon as the eyewitness enters the legal system, confidence and accuracy seem to take different paths. Even routine witness preparation and questioning, conducted without Machiavellian intent, will tend to boost the eyewitness's certainty, while having no positive impact on the eyewitness's accuracy." Id.

The long-held notion that witness confidence correlates with accuracy is not merely the product of lay perception. In fact, the Supreme Court has previously cited "the level of certainty demonstrated by the witness at the confrontation" as a "factor[] to be considered in evaluating the likelihood of misidentification." Neil v. Biggers, 409 U.S. 188, 199 (1972). However, in addition to academics and legal commentators, courts are increasingly taking note of research data indicating that witness confidence is a poor indicator of accuracy. See, e.g., Perry, ___ U.S. at ___, 132 S.Ct. at

26

732 (Sotomayor, J., dissenting) ("At trial, an eyewitness' artificially inflated confidence in an identification's accuracy complicates the jury's task of assessing witness credibility and reliability. It also impairs the defendant's ability to attack the eyewitness' credibility."); Phillips, __ F.3d at __, 2012 WL 414815 at *4 ("Jurors' evident belief that eyewitness confidence correlates with accurate identifications was once shared by many in the judiciary. . . . Subsequent research, however, has called this notion into very serious question."); and Haliym v. Mitchell, 492 F.3d 680, 706 n.15 (6th Cir. 2007) ("As a matter of law, we acknowledge that the witness' degree of certainty is a relevant factor to consider in determining reliability. We note, however, that empirical evidence on eyewitness identification undercuts the hypothesis that there is a strong correlation between certainty and accuracy.").

In this case, there is little doubt that the Overtons conveyed confidence in their identifications of petitioner as the attacker. Helen Overton identified petitioner as the intruder in-court without being prompted by the prosecutor, Tr. 21, and later testified that "I saw his face this time. I know it was him." Id. at 33.[17] Richard Overton testified that he knew it was petitioner because "I recognized, seen his face and I know him." Id. at 48. He later confirmed that his testimony and identification was based on "what happened that night. The man I'm looking at was shooting me, just shooting, bam. He just kept right on shooting." Id. at 51. Thus, given the Overtons' collective confidence and lack of equivocation in their identifications of petitioner and the complete lack of other evidence incriminating petitioner, it is likely that the jury, unfamiliar with "the psychology of

---

[17]   In fact, Helen Overton was admonished by the judge for "hollering" at defense counsel when he attempted to impeach her identification of petitioner by eliciting her testimony that she did not identify petitioner until after Mr. Overton had accused "the Moore boys" of the second robbery. Tr. 34.

27

witness identification," Phillips, 2012 WL 414815 at *3, placed significant weight on the degree to which the Overtons appeared confident in their identifications of petitioner.

Finally, an expert witness could have testified about circumstances possibly affecting the reliability of the Overtons' identifications of petitioner when presented with photographic lineups after the crime. Specifically, Dr. Van Wallendael states that it was improper, as a matter of sound investigation designed to lessen the likelihood of a false identification, for the photographic lineup shown to the Overtons to be "administered by an officer who was familiar with the case and knew which photograph depicted the suspect." Van Wallendael Aff. ¶ 11. See also Eyewitness Testimony § 4-10 ("Studies have found that when a lineup administrator is knowledgeable about the identity of an innocent suspect, there is a greater likelihood that an eyewitness will pick that suspect from a lineup."). She further observes that, because the Overtons were already familiar with petitioner due to their prior accusations against him, it was improper that "[n]one of the other photographs in the lineup were of persons who would have been familiar to the witnesses. Thus, it is likely that both witnesses would pick the familiar face; it would stand out from the alternatives." Id.

Apart from these observations about the failure to take reasonable precautions to minimize the likelihood of a false identification, Dr. Van Wallendael more fundamentally argues that the photographic lineups in this case should not have been administered in the first place, and are therefore entitled to little evidentiary weight:

> More importantly, however, I believe that it was inappropriate to show a photographic lineup to either of these witnesses, given the circumstances of the crime and their previous exposure to the defendant. Lineups are designed to test the memory of eyewitnesses for strangers. When a witness has already declared that the perpetrator was "John Doe" or "that guy who cleaned our pool last summer," there is nothing to be gained from having the witness view a lineup. The lineup simply proves that the witness can recognize John Doe, not that John Doe had anything to

28

do with the crime. It is almost inconceivable that the witness would pick anyone other than John Doe from the lineup. An identification has already been made; the lineup adds no new information. And, . . . although the lineup adds no evidence, it may have the effect of erroneously inflating the confidence of the witness and/or the investigating officers.

Id. at ¶ 12.

Based upon all of her observations about the unique facts and circumstances of the eyewitness identifications in this case, Dr. Van Wallendael offers the following conclusion:

it is my expert opinion that the two lineup identifications were invalid. Similarly, in-court identifications rarely add useful information for the jury; by this time, the witnesses have seen the defendant or the defendant's picture on multiple occasions, and can easily identify a defendant from his position in court anyway. The only potentially valid identification made in the case was the male witness's statement that it was the same two perpetrators as the last time. And given the witness's past experience and expectations, the stress of the situation and the presence of a weapon, and the cross-racial identification, there is a reasonable likelihood of a false identification. The jury should have been informed of the impact of these factors on memory, so as to better weigh the validity of the eyewitness evidence.

Id. at ¶ 15.

5.      Application of § 2254(d)

As the preceding review of Dr. Van Wallendael's affidavit makes clear, an expert witness could have provided the jury with substantial grounds for questioning the reliability of the eyewitness identifications in this case. Each of the grounds articulated by Dr. Van Wallendael is supported by empirical research, as discussed in relevant texts,[18] and most have previously been recognized in judicial opinions as appropriate examples for the admission of expert testimony on the subject of

---

[18] The court has relied in many instances on excerpts from Eyewitness Testimony: Civil and Criminal to augment the concepts described in Dr. Van Wallendael's affidavit. The Seventh Circuit recently referred to this title as "the standard text in this field" and surmised that a claimant alleging "that a particular kind of procedure led to an unreliable identification needs evidence–if not from an expert's affidavit, then from published work such as . . . Eyewitness Testimony: Civil and Criminal . . . ." Phillips, __ F.3d __, 2012 WL 414815 at *3.

29

eyewitness reliability. It is true that the jury could observe for itself such circumstances as whether this case involved a cross-racial identification or whether the witnesses' observations of their attacker were made under duress or in the presence of a weapon. However, the conclusion that the jury should be left to draw appropriate conclusions about the evidence misses the point of this claim: the expert witness would be uniquely qualified to educate the jury about the significant, documented effect these and other circumstances relevant to this case can have on perception and memory, circumstances which are not ordinarily known by jurors.[19] Likewise, while the jury learned through cross-examination of the witnesses that Helen Overton indeed did not identify petitioner until after her husband had done so, and that the Overtons had extensive prior exposure to petitioner due to their previous accusations against him, the expert witness could have testified about the recognized psychological phenomena underlying these circumstances that could possibly have caused a misidentification in this case. In short, the expert could "have informed the jury of *why* the eyewitness's identifications were inherently unreliable. This would have been a scientific, professional perspective that no one else had offered to the jury." Forensic, 501 F.3d at 477. Without the benefit of this informed, "professional perspective," "the jury had no basis beyond

---

[19] Indeed, Eyewitness Testimony: Civil and Criminal makes the point that, due to common juror misconceptions about eyewitness testimony which have been illustrated by empirical data, when jurors are simply left to draw their own conclusions from witness testimony, eliciting on cross-examination certain facts about the circumstances of the event may have opposite of the intended effect by causing jurors to give even more credence to aspects of the witness's testimony which are actually impeaching. See Eyewitness Testimony § 6-6. For example, many jurors do not understand, as a matter of commonsense, "that 'weapon focus' makes identification in cases involving weapons less reliable" or "that severe stress impedes memory." Id. Thus, "it may do little good for an attorney to elicit on cross-examination the fact that the accident was violent if the jurors will then use that fact to enhance their confidence in the eyewitness. A fact that, according to psychological findings, should undercut the jurors' confidence in eyewitness accounts may end up only augmenting it." Id.

30

defense counsel's word to suspect the inherent unreliability of the [victims'] identifications." Id. at 482.

Nevertheless, and despite the considerable amount of evidence proffered to the MAR court in support of the claim that counsel was ineffective for failing to procure an expert witness, the state court concluded simply that "[t]he defendant does not suggest that there is any more evidence regarding the identification . . . and that there was no showing to justify or require an expert on identification." MAR Order 2. The state court reached this decision without the benefit of an evidentiary hearing, at which the expert and any other witnesses could have testified about the factors described in her affidavit. In fact, there is no mention of Dr. Van Wallendael's affidavit or any of the many discrete circumstances discussed in the affidavit in the state court's summary order disposing of this claim. Importantly, the MAR court did not find, and there was no evidence before it, that counsel reasonably investigated the possibility of retaining an expert but determined not to hire one as a matter of reasonable strategy, that counsel attempted to procure an expert but was unsuccessful in locating one, or that the trial court denied some request for funding for a putative expert or ruled that any such expert testimony would be inadmissible as a matter of law. Instead, the MAR court concluded only that petitioner had failed to allege the existence of any more evidence concerning the identifications and had failed to demonstrate even a justification for such an expert.

This court finds that "fair-minded jurists" could not dispute whether petitioner alleged the existence of additional evidence regarding the eyewitness identifications, or whether the significant body of expert evidence proffered by petitioner sufficed to show at least a justification for the use of an expert witness given the highly unusual facts of this case. Thus, the court finds that the state court's judgment as to this claim is unreasonable within the meaning of § 2254(d), in that the state

31

court unreasonably applied the Supreme Court's <u>Strickland</u> decision to the facts of this case and, moreover, based its decision on an unreasonable determination of the facts in light of the evidence presented to the state court.

6. The merit of petitioner's ineffective assistance claim.

Because petitioner has established that the state court's adjudication of his claims involved an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," this court must proceed to review petitioner's claim independently to determine whether habeas relief is warranted. <u>Rose</u>, 252 F.3d at 689-90. <u>See also</u> <u>Frazer</u>, 430 F.3d at 718 ("Because the state court's decision in this case was both contrary to and involved an unreasonable application of clearly established federal law, the district court properly reviewed Frazier's claim *de novo*."); <u>Lynch</u>, 204 F. App'x at 170 (unpublished decision) ("If a legal or factual error of the degree specified in § 2254(d)(1) or (d)(2) occurred, then a federal court has the obligation to conduct an independent review of the petitioner's claims to determine whether the issuance of a writ is warranted."). As discussed *supra*, petitioner must show both that his counsel was deficient in failing to procure expert testimony and that, but for this deficient performance, there is a reasonable probability that the result of his trial would have been different. For the reasons that follow, the court finds that petitioner received the ineffective assistance of counsel at trial.

The court recognizes that, although this judgment amounts to no more than a straightforward application of <u>Strickland</u> to the unique facts of this case, the court's decision may be considered novel. However, it is not without precedent. First, in the <u>Forensic</u> case, which is discussed above and which similarly involved the eyewitness identifications of a victimized couple attacked in their own home with no physical evidence of the guilt of the defendant, the district court found counsel

32

ineffective for failing to procure expert witness testimony about the unreliable identifications of the victim witnesses. See Ferensic v. Birkett, 451 F. Supp.2d 874, 886-87 (E.D. Mich. 2006). Although the Sixth Circuit did not reach specifically the issue of whether counsel was ineffective during its consideration of the appeal, the appellate court's discussion of the viability and usefulness of expert testimony in that case remains instructive. Moreover, at least one federal appellate court has held, in somewhat analogous circumstances, that counsel was ineffective for failing to consult with a medical expert about the reliability of an eyewitness's identification. See Bell v. Miller, 500 F.3d 149 (2d Cir. 2007).

In Bell, the shooting victim was the lone eyewitness to identify the defendant as the shooter. At the scene, and after losing copious amounts of blood, the victim described the shooter only as "'a male black, wearing a lemon-colored shirt.'" Id. at 152. For the next eleven days the victim was hospitalized and heavily sedated, "comatose if not actually in a coma." Id. After emerging from this state, the victim identified Bell, a former neighbor in a rooming house, as the shooter. Id. In grand jury testimony, the victim admitted that he was taking medications for his pain and was suffering from memory loss. Id. At trial, Bell's attorney elicited testimony that the victim did not identify the defendant until after he had spent eleven days essentially unconscious, but did not probe the issue of memory loss. Id. Furthermore, while counsel cross examined the physician who treated the victim at the hospital about the effects of blood loss on consciousness, counsel did not ask about possible impacts on memory of blood loss or the medications the victim was taking. Id. Counsel also presented an alibi defense, which included the testimony of Bell and other witnesses who claimed that Bell was with them at the time of the shooting. Id. at 153.

Reaching the merits of Bell's claim that counsel was ineffective in failing to offer expert

33

testimony about the reliability of the victim's identification, the Second Circuit observed as follows:

> The only evidence connecting Bell to the crime was [the victim's] testimony. Three friends testified that Bell was elsewhere playing cards. Given the trauma [the victim] endured and the medical treatments he received, [his] memory was highly vulnerable to attack by scientific evidence. Minutes after an encounter in which he stood face-to-face with the assailant for five minutes, [the victim] told police officers that his assailant was a "male black wearing a lemon-colored shirt," a description that implicitly but undeniably indicates that the assailant was a stranger: one does not fall back on general features (a "male black") or the color of a shirt ("lemon" yellow) to express the identity of a person known by name or affiliation.

Id. at 155. The court found that, while counsel did cross examine relevant witnesses "in an effort to cast doubt on [the] identification[,] . . . counsel's failure even to investigate the scientific implications of [the victim's] trauma, blood loss and sedation handicapped his cross-examination of those key prosecution witnesses." Id. at 156. The court also found that "the record reveals no 'tactical justification for the course trial counsel chose. The defense proceeded along two strategic lines: impeaching [the victim] and establishing an alibi. The first of these would have been promoted, without any appreciable downside, by expert medical testimony on the impact that blood loss and painkillers had on [the victim's] memory." Id. at 157 (citations and quotations omitted). Thus, the court found that counsel rendered ineffective assistance.

There are numerous parallels between this case and Bell. For example, in this case, as in Bell, "[t]he prosecution's case against [petitioner] was thin–there was no eyewitness other than [the Overtons]; no witness or other evidence (forensic or otherwise) linked [petitioner] to the crime." Id. at 155-56. In addition, in this case, as in Bell, the primary eyewitness, who was already familiar with petitioner from prior accusations against him, did not immediately identify petitioner to responding police and instead described the intruder as a skinny black man wearing dark clothes. This vague and generic description "implicitly but undeniably indicates that the assailant was a stranger: one

34

does not fall back on general features (a "male black") or the color of a shirt ("lemon" yellow) to express the identity of a person known by name or affiliation." Id. at 155. Furthermore, whereas in Bell counsel neglected to investigate and introduce expert medical testimony about the effects of blood loss, loss of consciousness, and medications on the witness's memory, in this case counsel neglected to pursue and introduce expert psychological opinion–which is supported in abundance by empirical data and had been recognized in case law for years prior to trial–on the numerous factors which could have precipitated a faulty identification in this case. Finally, counsel in this case employed the same "strategy" as the attorney in Bell: expose weaknesses and inconsistencies in the eyewitness's account through cross-examination while also providing an alibi defense. For the reasons discussed in Bell, such strategy may be insufficient in extraordinary circumstances.

Considering this matter objectively from counsel's perspective at the time of trial, the court concludes that counsel rendered deficient performance in failing to obtain expert testimony. It is apparent that the State's case hinged entirely on the eyewitness identifications by the Overtons. To the extent the State introduced any other "evidence" of the crime, including supposed instrumentalities of the crime–a firearm and latex gloves–such evidence was not connected to petitioner or the crime, was erroneously admitted by the trial judge, and, indeed, was deemed "irrelevant" and "prejudicial" by the North Carolina Court of Appeals. Because the eyewitness identifications were the only evidence of petitioner's guilt, it was incumbent upon counsel to reasonably investigate available means of impeaching such testimony, including through the use of expert testimony. As set forth above, expert testimony is uniquely capable of illustrating to the jury why a given identification may not be reliable and, in the absence of any record evidence that

35

counsel considered but reasonably decided not to pursue such strategy,[20] the court finds that counsel rendered deficient performance.

It is not a sufficient defense of counsel's performance to assert simply that counsel's cross-examination of the Overtons and his attempt to establish an alibi rendered his performance constitutionally adequate. To the extent this tact can be considered "strategy," in effect it merely forced the jury to decide whether it believed petitioner and his mother or the Overtons were lying. Counsel's failure to procure expert testimony precluded the jury from considering a vast body of evidence establishing that, in certain circumstances which are present in this case, an eyewitness's account of events should not be taken at face value. The expert witness could have clarified and explained some of the complex psychological factors possibly influencing the Overtons' accounts, thereby providing the jury with a reasonable basis for questioning the accuracy of the Overtons' identifications without necessarily questioning whether the Overtons were attempting to testify truthfully. In that event, the jury would not have been forced to simply choose between the Overtons and petitioner, but would have had the opportunity to assess whether the psychological hallmarks of an erroneous identification discussed by the expert were sufficiently persuasive to find reasonable doubt of petitioner's guilt. Counsel's failure to consider such expert testimony is particularly troubling because there was no overarching "strategy" that required counsel to choose between

---

[20] Disturbingly, the State has failed, both in state court and in this court, to offer any meaningful rebuttal to the considerable evidence petitioner has adduced tending to establish that the eyewitness identifications in this case are emblematic of numerous circumstances which have been recognized to result in misidentifications. In state court, the State merely asserted that petitioner's claim is without merit and the MAR court did not hold a hearing before summarily denying the claim without specific mention of petitioner's evidence. In this court, rather than materially addressing the underlying merit of petitioner's claim, respondents merely assert that, because of the purported effect of Harrington and Cullen, petitioner cannot surmount the bar imposed by § 2254(d).

36

sponsoring appropriate expert testimony or vigorously cross examining the witnesses and establishing alibi. The two courses are not exclusive; indeed, as previously recognized by the Fourth, Second, and Sixth Circuits in Harris, Bell, and Ferensic respectively, they are extremely complementary and, in certain cases, should be employed in tandem. While counsel's cross-examination might have succeeded in drawing-out inconsistencies in the identifications, expert testimony about the unique confluence of psychological factors in this case "would have informed the jury of *why* the eyewitness's identifications were inherently unreliable. This would have been a scientific, professional perspective that no one else had offered to the jury." Ferensic, 501 F.3d at 477 (emphasis in original). Any argument that counsel's decision was the result of reasoned strategy is further undercut by the Sixth Circuit's observation that "'other means' of attacking eyewitness identifications do not effectively substitute for expert testimony on their inherent unreliability." Id. at 481. Thus, counsel's failure to obtain an appropriate expert witness was deficient pursuant to Strickland.

As for prejudice, the court finds that, considering the lack of other evidence of guilt, indeed that "prejudicial" and "irrelevant" evidence was admitted erroneously, there is a 'reasonable probability' that had counsel consulted with [and offered the testimony of a psychological] expert, 'the result of the proceeding would have been different.'" Bell, 500 F.3d at 155 (quoting Strickland, 466 U.S. at 694). Because of this lack of evidence, "[i]mpeaching [the Overtons'] testimony was therefore all in all for the defense. Armed with the insight and advice [or testimony] of a [psychological] expert, a lawyer could have vastly increased the opportunity to cast doubt on this critical evidence." Id. at 156. See also Ferensic, 451 F. Supp.2d at 886-87. Counsel's failure to obtain and present this sort of evidence "undermine[s] confidence in the outcome" of petitioner's

37

trial. Strickland, 466 U.S. at 694. Accordingly, petitioner was prejudiced by counsel's failure to consult with and sponsor the testimony of an expert witness in the field of eyewitness identification and memory.

>        7.        Conclusion

For the reasons set forth above, the court finds that the MAR court's decision denying petitioner's ineffective assistance of counsel claim based on counsel's failure to procure an expert on the fallibility of eyewitness testimony was unreasonable within the meaning of § 2254(d), in that the state court unreasonably applied Strickland v. Washington to the facts of this case and, moreover, reached its decision based upon an unreasonable determination of the facts before the state court. The court further finds that, considering the merits of petitioner's claim *de novo*, counsel rendered deficient performance and such performance prejudiced petitioner in that it is reasonably likely that, but for counsel's deficient performance, the result of petitioner's trial would have been different.[21]

---

[21] The court will here address two other arguments made by respondents pertaining to this claim. Respondents first contend that "there is no clearly established federal law, as determined by the Supreme Court of the United States, requiring defense counsel to hire an 'expert in the fallibility of eye-witness testimony,' in order to provide effective assistance when the state's case is based on eye-witness testimony." Resps.' Mem. 11. Thus, respondents conclude, the MAR court order "cannot be contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the Untied States." Id. Respondents misrepresent the operation of § 2254(d) and the scope of Strickland. There is no requirement for a Supreme Court decision imposing on defense counsel the obligation to always retain an expert witness in cases such as this in order for counsel to considered ineffective in this instance. The operative "clearly established federal law" is the Supreme Court's Strickland decision, and, to the extent the court finds any federal law to have been unreasonably applied by the MAR court, it is that decision and its progeny. See, e.g., Elmore, 661 F.3d at 856-866 (recognizing that Strickland is controlling federal law and finding state court to have unreasonably applied Strickland when it concluded that counsel's failure to adequately investigate forensic evidence prior to trial, including neglecting to hire independent forensic experts, was not ineffective).

For these same reasons, respondents' contention that this claim should be "deemed barred
(continued...)

38

The court considers it important to emphasize the narrow basis of its decision. The court is not holding that, in any case in which an eyewitness identification is utilized by the prosecution at trial, defense counsel must always consult with an expert in the field of eyewitness perception and memory in order to render constitutionally adequate performance. Rather, the court is simply applying the well-established rule that counsel is obligated to undertake a reasonable investigation of available courses of action in order to provide a constitutionally adequate defense to the highly unique facts of this case. Where there is no evidence of guilt other than victim-eyewitness identifications which so blatantly present numerous grounds for questioning their reliability, grounds which are discussed in abundance in relevant literature and judicial opinions but are not commonly known to jurors, counsel must reasonably investigate and consider whether to present available

---

[21](...continued)
from federal habeas review by Teague v. Lane, 489 U.S. 288 (1989)" is also unavailing. Resps.' Mem. 12. Respondents again espouse an unduly truncated interpretation of Strickland. Because the only "rule" being applied is Strickland, the court is not fashioning a "new rule" of constitutional law. See Williams v. Taylor, 529 U.S. at 391 ("[T]he Strickland test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims[.]"). Thus, because "the beginning point is a rule of this general application [Strickland], a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." Wright v. West, 505 U.S. 277, 308-09 (1992) (Kennedy, J., concurring). It is for this reason, for instance, that courts have determined that Rompilla v. Beard, 545 U.S. 374 (2005), although it found counsel ineffective for failing to examine a file concerning a previous conviction of the defendant, did not announce a new rule of constitutional law for Teague purposes but, instead, merely applied "Strickland's standard to a specific set of circumstances." Newland v. Hall, 527 F.3d 1162, 1197 (11th Cir. 2008). See also Frazer, 430 F.3d at 704-05 (holding that rule of Roe v. Flores-Ortega, 528 U.S. 470 (2000), finding that counsel has a duty to consult with the defendant regarding appeal, "does not present a new constitutional rule under Teague . . . [but rather] simply crystalizes the application of Strickland to the specific context presented by Frazer's claim). Thus, this claim, and the court's resolution of it, is not barred by Teague.

39

expert testimony in an effort to impeach the eyewitness identifications.[22]

B.  Claims I.B and I.C.

Petitioner's next claims are that counsel was ineffective "for not filing a motion to suppress" the out-of-court and in-court identifications given by the Overtons. Pet. 13-14. Petitioner argues that, because both of the Overtons' out-of-court identifications are suspect for the reasons described *supra*, "[c]ounsel's performance in failing to move to suppress these identifications fell below the standard of professionalism. There is more than a reasonable probability that this failure affected the outcome of this case." Id. Respondents contend that, "[g]iven the strength of . . . eye-witness testimony, a motion to suppress the in-court or out-of-court identifications would have been futile." Resps. Mem. 8.

The MAR court rejected these claims, finding "that evidence as to the out-of-court and in-court identification of the defendant was fully presented to the jury" and that the "weight of the evidence was for the jury." MAR Order 2. Hence, the MAR court found petitioner "failed to show that counsel's performance fell below an objective standard of reasonableness . . . [or that] there is a reasonable probability that, but for any alleged errors of trial counsel, there would have been a different result in the trial . . . ." Id.

Petitioner's contention that the identifications were "suppressible" derives from his

---

[22]  See, e.g., Bell, 500 F.3d at 157 ("Our disposition of this appeal does not announce a *per se* rule requiring a defense counsel to consult with a medical expert in order to cast doubt on a key prosecution witness. But where the only evidence identifying a criminal defendant as the perpetrator is the testimony of a single witness, and where the memory of that witness is obviously impacted by medical trauma and prolonged impairment of consciousness, and where the all-important identification is unaccountably altered after the administration of medical drugs, the failure of defense counsel to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness is constitutionally ineffective.").

40

overarching argument that the identifications are inherently unreliable given the factual circumstances of the event, not that they were the product of unduly suggestive police practices and are therefore subject to suppression as a matter of due process. See Pet. 13-14; Pet'r's Mem. 7-9. He argues that in North Carolina, evidence is admissible if inherently incredible. Pet'r's Mem. 7 (citing State v. Miller, 270 N.C. 726, 731-32, 105 S.E.2d 902, 905-06 (N.C. 1967)). Accordingly, in order to determine whether the MAR court unreasonably applied Strickland as to this claim or otherwise rendered a decision that was based on an unreasonable determination of the facts before the court, this court must consider the likelihood that a motion to suppress on the grounds articulated by petitioner would have been granted.

North Carolina law requires that "where there is a reasonable possibility of observation sufficient to permit subsequent identification, it is for the jury to decide the credibility of and the weight to be given the witness' testimony." State v. Parker, 350 N.C. 411, 432, 516 S.E.2d 106, 121 (N.C. 1999) (quotation and citation omitted); see also Miller, 270 N.C. at 732, 154 S.E.2d at 906 ("Where there is a reasonable possibility of observation sufficient to permit subsequent identification, the credibility of the witness' identification of the defendant is for the jury . . . ."). Thus, in Miller, the North Carolina Supreme Court determined that "testimony identifying the defendant as the man seen running along the side of a building at night at a distance of 286 feet should not be submitted to the jury." Parker, 350 N.C. at 432, 516 S.E.2d at 121. See also State v. Sneed, 327 N.C. 266, 272-73, 393 S.E.2d 531, 534-35 (N.C. 1990) (explaining that, in Miller, the North Carolina Supreme Court "concluded that, where the sole evidence tending to identify the defendant as the perpetrator of the crime charged was evidence which was inherently impossible or in conflict with indisputable facts or laws of nature, the evidence was not sufficient to take the case

41

to the jury").

In this case, by contrast, the evidence showed that Helen Overton engaged in a conversation with the unmasked intruder, prior to the attack, at a short distance under lighted conditions. Tr. 20-22. Whatever can be said about the myriad circumstances which may have rendered her identification unreliable, it is evident that she at least had a "reasonable possibility of observation sufficient to permit subsequent identification." Miller, 270 N.C. at 732, 154 S.E.2d at 906. Nor can it be said that Richard Overton's identification of petitioner, strained as it was by the circumstances, was "inherently impossible or in conflict with indisputable facts or laws of nature." Sneed, 327 N.C. at 272-73, 393 S.E.2d at 534-35. Accordingly, under North Carolina law, evidence of the in-court and out-of-court identifications was admissible and the weight of the evidence was to be decided by the jury. Thus, the state MAR court's determination that petitioner cannot demonstrate deficient performance or prejudice as to this claim is not unreasonable within the meaning of § 2254(d).

C.    Claim I.D

Petitioner's next claim is that counsel was ineffective in failing to cross-examine Mr. Overton on his eyesight and opportunity to view the intruder. Pet. 14. Petitioner contends that, because counsel was in possession of Mr. Overton's medical records, he knew that "Richard Overton suffers from Type 2 diabetes, had not taken insulin or seen a physician in at least two years, and smoked four packs of cigarettes a day. One of the known side-effects of diabetes is retinopathy, which is a disease of the retina which can lead to loss of vision." Id. Petitioner further contends that counsel "never cross-examined Richard Overton on his opportunity to view the assailant. Based upon the Overtons' testimony about the unfolding of events on the night of the offense, Mr. Overton could logically only have seen the man at the door for only a few moments before he was shot. Defense

42

counsel never explored this issue." Id.

The state MAR court's finding that petitioner has failed to show deficient performance or prejudice as to this claim is not contrary to or an unreasonable application of Strickland, nor is it based on an unreasonable determination of the facts in light of the evidence before the court. While it is true that counsel was in possession of a hospital record indicating that Mr. Overton was a non-compliant diabetic who suffered from bouts of blurred vision, petitioner has not shown that Mr. Overton actually suffered from retinopathy or that his vision was materially impaired on specifically the night of the attacks. Thus, petitioner's claim is unduly predicated on his own speculation. As such, petitioner has not established actual prejudice from counsel's failure to cross-examine Mr. Overton on his eyesight, and the state court's decision is not unreasonable within the meaning of § 2254(d).

Likewise, petitioner has failed to establish deficient performance or prejudice respecting his claim that counsel was ineffective for failing to cross-examine Mr. Overton on his opportunity to view the intruder. The direct examination of Mr. Overton amply establishes the circumstances which petitioner faults counsel for not "exploring" on cross-examination. Accompanied by visual aids, Mr. Overton testified about the layout of his home, including the kitchen area where he confronted the intruder. Tr. 45. He testified that he awoke to his wife's screaming, went straight for his gun at the table, and, as he was reaching for his pistol he was looking in the direction of the door where the intruder had entered. Id. at 47. He then testified that, after obtaining his pistol he was shot by the intruder before he could raise his gun to fire. Id. at 49. The shots caused him to drop his pistol, which he then immediately fell to the floor in an attempt to find. Id. at 49-50. The intruder fled the house while Mr. Overton was trying to pick-up his gun. Id. Given all of this testimony, the jury

43

could not have been left with any reasonable conclusion other than that Mr. Overton's opportunity to view the intruder was very brief, consisting of only a few seconds at most, and that under significant duress. Even petitioner concedes this is a matter of "logic." Pet'r's Mem. 14. The jury is capable of drawing appropriate logical conclusions from the evidence without the need for counsel to rehash testimony, especially where it appears that counsel attempted to impeach Mr. Overton's testimony through other means.[23] Thus, petitioner's assertion that the "jury did not hear from what distance Mr. Overton viewed the intruder" and "did not hear how brief Mr. Overton's opportunity to vew the intruder was," id. at 15, is unavailing. The direct examination of Mr. Overton sufficiently established these circumstances such that there was little, if any, to be gained from further exploration by defense counsel on cross-examination. Accordingly, the state MAR court's finding that petitioner has failed to establish deficient performance or prejudice as to this claim is not unreasonable within the meaning of § 2254(d).

D.    Claim I.E

Petitioner's final claim is that counsel rendered ineffective assistance in failing to "object to the admission of a weapon that was unrelated to Defendant's case, as well as failing to object to forensics reports and testimony regarding the weapon and forensic testing." Pet. 15. He argues that,

---

[23] For example, it is clear that counsel sought to impeach Mr. Overton by eliciting testimony on cross-examination that he mistakenly identified both of "the Moore boys" as the perpetrators when, in fact, he only saw one perpetrator and one of "the Moore boys" could not have been present because he was incarcerated at the time. Tr. 51-53. Counsel further sought to impeach Mr. Overton by eliciting his testimony that he had been convicted of crimes including "DWI, gambling, traffic violations," and some unspecified offenses possibly involving "signing a certificate of title in blank" and "selling vehicles without the vehicle identification number." Id. at 54-55. Given the focus of counsel's cross-examination, it is reasonable to conclude that he saw little to be gained from leading Mr. Overton again through his testimony that counsel's client shot him in his own kitchen, especially where the pertinent facts about his limited opportunity to view the intruder were already in evidence and within the jurors' logical faculties.

44

"[i]n a case such as this, where the identifications of the complaining witnesses were problematic, any piece of physical evidence would tilt the scales in favor of conviction. The North Carolina Court of Appeals already determined that this evidence was prejudicial to Mr. Moore. There is a reasonable probability that this error, compounded with the previously discussed errors of trial counsel, negatively affected the jury's verdict." Id. at 17. Respondents bizarrely maintain that "counsel had no reason to object to the admission of the handgun, rubber gloves, forensic report and testimony related thereto, because none of that evidence was tied to Petitioner, or inculpated him in any way." Resps.' Mem. 8.[24]

As noted above, petitioner argued on direct appeal of his conviction that admission of this evidence, as well as a pair of latex gloves also entered into evidence but which also could not be connected to petitioner or the crime, constituted plain error. The North Carolina Court of Appeals determined that the firearm and gloves were "irrelevant and prejudicial," and therefore should not have been admitted, but that the error did not amount to plain error because the court was "not convinced that absent the error the jury probably would have reached a different verdict." Moore, 2008 WL 851054 at *5-*6 (quotation and citation omitted). As to the forensic report and related testimony, the court rejected petitioner's contention that a witness's testimony about the report's findings constituted hearsay. Id. at *6. The court further found that, while the report itself fit within

---

[24] Of course, the reason why counsel should object to the admission of a firearm in a case involving a shooting where the firearm has not actually been linked to the shooting is manifest. As the North Carolina Court of Appeals concluded, admission of the irrelevant evidence in this case was "prejudicial." Moore, 2008 WL 851054 at *5. Respondents' circular argument that counsel had no cause to object to such "irrelevant and prejudicial" evidence precisely because it was not "tied to him" or "inculpatory" would countenance the admission of essentially any piece of evidence in any case, no matter its irrelevance or its prejudicial or inflammatory nature. The rules of evidence clearly set a higher standard for admissibility of evidence.

the business records exception to the hearsay rule, it was not properly admitted because "the State failed to introduce the evidence by the testimony of the custodian or other qualified witness." Id. (quotation and citation omitted). Nevertheless, although admission of the report constituted error, the court again found no plain error because the report indicated that tests on the firearm proved "inconclusive" and, therefore, its admission "could not have tilted the scales and caused the jury to reach its verdict convicting the defendant." Id. at *7. Finally, the court also rejected petitioner's claim that admission of the report and testimony about the report violated his Sixth Amendment right to confront the witnesses against him, as set forth in Crawford v. Washington, 541 U.S. 36 (2004). The court found that because testimony about the report was not hearsay and because the report did not "constitute testimonial statements," their admission did not violate petitioner's Sixth Amendment rights. Moore, 2008 WL 851054 at *7-*8.[25]

In his MAR, petitioner argued that counsel's failure to object to the admission of this evidence was ineffective assistance. The MAR court found that petitioner "failed to show that counsel's performance fell below an objective standard of reasonableness; [and] . . . failed too [sic] show that there is a reasonable probability that, but for any alleged errors of trial counsel, there

---

[25]     The Supreme Court's subsequent decision applying Crawford in Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), casts serious doubt on the correctness of this aspect of the state court's decision. Even assuming the state court erred, however, two important points preclude petitioner from obtaining relief on the basis of any such error. First, if the state court erred it was within the context of a different claim than that presently before the court. Petitioner is alleging ineffective assistance of counsel in the instant case, not a direct constitutional challenge to the admissibility of the report, as was decided in the state court on direct appeal. Second, and more significantly, as set forth more fully supra, this court is to review state court judgments on the merits for unreasonableness, not mere correctness. Hence, even if it can be argued that the state court erred with respect to its Confrontation Clause analysis, it does not follow that the state court unreasonably applied Crawford to the facts of this case. See, e.g., Likely v. Ruane, 642 F.3d 99, 102-03 (1st Cir. 2011) (finding that, although state court erred in applying Crawford prior to Melendez-Diaz, state court was not unreasonable and, therefore, habeas relief was not warranted).

46

would have been a different result in the trial; [and] . . . that any alleged errors in . . . stipulating to the admission of evidence were harmless beyond a reasonable doubt." MAR Order 2.

The court finds that, even assuming counsel was deficient in failing to object to the admission of this "irrelevant and prejudicial" evidence, the MAR court's finding that petitioner did not suffer "prejudice" of Sixth Amendment magnitude is neither contrary to or an unreasonable application of federal law, nor based upon an unreasonable determination of the facts before the state court. As discussed by the North Carolina Court of Appeals on direct review, the firearm could not be linked to petitioner or the crime, and the forensic report reflected this fact. On cross-examination of Detective Harrell, counsel elicited his testimony that the gun had been located during a separate investigation about five or six miles from the Overtons' home, that he had no idea whether the gun had been used during the crime, that he related the two initially only because is was a small caliber firearm, and that he did not believe that the pair of gloves erroneously admitted was connected to petitioner or the crime. Tr. 80-81. Likewise, the report stated on its face that it was inconclusive whether the firearm discharged the projectiles recovered at the scene. Moore, 2008 WL 851054 at *7.

Petitioner discounts the import of these showings by arguing that the "very presence [of the firearm and forensic report] among the State's exhibits gave an impermissible impression to the jury that it was *somehow* related to the case and that the State had physical evidence against Mr. Moore. Even if the prosecution could not show a clear connection, it would have been clear to the jury that the State *believed* it was the gun used against the Overtons or else why had the State introduced it?" Pet. 16. However, given counsel's success in demonstrating that none of this evidence could be linked with petitioner or the crime, and given that the report expressly did not inculpate petitioner,

47

petitioner has not shown, apart from his own speculation, that admission of this evidence so tainted the jury's deliberations that there is a "substantial, not just conceivable, likelihood of a different result" had counsel objected to admission of the evidence. Cullen, 563 U.S.at __, 131 S.Ct. at 1403 (internal quotations omitted). As such, the MAR court's finding that petitioner failed to demonstrate prejudice as to this claim is not contrary to or an unreasonable application of Strickland and is not based upon an unreasonable determination of the facts before that court.

IV.    Other Pending Motions

Petitioner has also filed a motion to amend [D.E. # 3] his petition. The motion seeks only to remove surplus language from the "Statement of the Case" portion of the petition. The motion to amend will be granted.

On August 22, 2011, petitioner filed a motion for leave to proceed *in forma pauperis* [D.E. # 6] despite the fact that he fully paid the applicable filing fee at the time he filed the petition. On September 7, 2011, petitioner filed a motion to withdraw [D.E. # 11] the motion for leave to proceed *in forma pauperis*. Because petitioner paid the requisite filing fee for this action, the motion to withdraw will be granted and the motion for leave to proceed *in forma pauperis* will be withdrawn.

## CONCLUSION

For all of the reasons stated above, the court orders as follows:

a.    petitioner's motion to amend [D.E. # 3] is GRANTED;

b.    petitioner's motion to withdraw [D.E. # 11] his motion for leave to proceed *in forma pauperis* is GRANTED and the motion is withdrawn;

c.    respondents' motion for summary judgment [D.E. # 8] is GRANTED as to Claims I.B, I.C, I.D, and I.E of the petition and DENIED as to Claim I.A of the petition;

48

d.    petitioner's motion for summary judgment [D.E. # ] is GRANTED as to Claim I.A of the petition and DENIED as to Claims I.B, I.C, I.D, and I.E of the petition;

e.    Claims I.B, I.C, I.D, and I.E of the petition are DISMISSED;

f.    with respect to Claim I.A, petitioner's claim that he received ineffective assistance of trial counsel due to counsel's failure to consult with and call as a witness an expert in the fallibility of eyewitness testimony, the court finds that petitioner has demonstrated that the state court's resolution of such claim was unreasonable pursuant to 28 U.S.C. § 2254(d) and that, furthermore, he received ineffective assistance of counsel in violation of the Sixth Amendment to the Constitution; and

g.    a writ of habeas corpus vacating petitioner's conviction shall issue, and the State of North Carolina shall release petitioner from its custody unless, within 180 days from the date of this order, the State initiates a new trial against petitioner.

SO ORDERED. This the 30th day of March, 2012.


_James C. Fox_

JAMES C. FOX
Senior United States District Judge

49